# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 12, 2008      Decided November 7, 2008

No. 08-5141

TEVA PHARMACEUTICALS, USA, INC.,
APPELLEE

v.

MICHAEL O. LEAVITT, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08cv00395)

———

*Gerald F. Masoudi*, Associate General Counsel, U.S. Department of Health and Human Services, argued the cause for appellants. With him on the briefs were *Gregory G. Katsas*, Acting Assistant Attorney General, U.S. Department of Justice, *C. Frederick Beckner III*, Deputy Assistant Attorney General, *Eugene M. Thirolf*, Director, *Drake Cutini*, Attorney, and *Eric M. Blumberg*, Deputy Chief Counsel, U.S. Department of Health and Human Services.

*Jay P. Lefkowitz* argued the cause for appellee. With him on the brief were *Michael D. Shumsky* and *Gregory L. Skidmore*.

Before: BROWN and KAVANAUGH, *Circuit Judge*s, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN, in which *Circuit Judge* KAVANAUGH joins.

Opinion concurring in the judgment filed by *Senior Circuit Judge* WILLIAMS.

BROWN, *Circuit Judge*: The Hatch-Waxman Amendments help to expedite the marketing of generic drugs. Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, § 101, 98 Stat. 1585, 1585 (1984). Getting a new "branded" drug to market is a time-consuming process. The manufacturer must file a New Drug Application (NDA) with the Food and Drug Administration (FDA), showing the new drug is safe and effective and identifying the number and expiration date of any patent or patents applicable to the drug. 21 U.S.C. §§ 355(a), (b). FDA has to publish this information. *Id.* § 355(b)(1). It meets this obligation by publishing a directory of *Approved Drug Products with Therapeutic Equivalence Evaluations* (also known as the Orange Book), a printed cumulative supplement to the Orange Book, and an electronic version of the Orange Book.

A manufacturer preparing to market a generic bioequivalent of a branded drug can take a short-cut: filing an Abbreviated New Drug Application (ANDA) that piggybacks on the original manufacturer's evidence of safety and efficacy. *Id.* § 355(j). To start the process, the ANDA applicant must certify—for each patent claiming a drug for which the applicant is seeking

approval—under one of four paragraphs that (I) patent information has not been filed; (II) the patent has expired; (III) the patent will expire on a specified date; or (IV) the patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted. *Id.* § 355(j)(2)(A)(vii). The first drug manufacturer to file an approved ANDA, containing a paragraph IV certification, is rewarded with a 180-day period of marketing exclusivity for the manufacturer's generic version of the drug. *Id.* § 355(j)(5)(B)(iv). Marketing exclusivity is valuable, designed to compensate manufacturers for research and development costs as well as the risk of litigation from patent holders. *See* 35 U.S.C. § 271(e)(2)(A) (stating a generic drug company certifying under paragraph IV commits an act of infringement for which the brand-name drug's patent holder can sue). In this case, we referee an unusual dispute between FDA and an ANDA applicant about the effect of a paragraph IV certification submitted after the patent had been withdrawn by the NDA holder but before FDA deleted the patent information from the hardcopy version of the Orange Book.

FDA insists reality matters. The point of paragraph IV, the Agency argues, is to reward risk when an applicant challenges a patent that would otherwise preclude price competition. Teva Pharmaceuticals counters that FDA's obligations to keep the industry reliably informed is enforced—at least in part—by punishing the Agency's inadvertence when the Orange Book does not reflect the Agency's most current information.

I

Janssen Pharmaceuticals got FDA approval to market Risperdal in 1993 and submitted information for two patents, the '663 patent and the '952 patent. *See* Letter from Janet Woodcock, M.D., Acting Director, CDER, FDA to D. Jaskot,

M.S., R.A.C., Teva Pharmaceuticals USA, regarding Docket No. 2007P-0316/CP1 and CR1 (February 26, 2008) ("FDA Letter") at 4. FDA listed both patents in the Orange Book. On April 4, 2001, Janssen withdrew the '952 patent for several different strengths of the drug, and on June 11, 2001 sent FDA a clarification requesting the withdrawal of remaining strengths. *Id.* FDA modified its patent listing database on June 11, 2001 and updated the electronic Orange Book to reflect the delisting sometime between June 29, 2001 and July 20, 2001. *Id.* FDA conceded in its brief that neither the printed Orange Book nor its printed cumulative supplement reflected the delisting until 2002.

Meanwhile, on August 28, 2001, Teva submitted an ANDA for a generic version of Risperdal, containing a paragraph IV certification to the '952 patent. *Id.* at 5. FDA promptly informed Teva that the '952 patent had been delisted and asked Teva to submit a revised ANDA. *Id.* Teva acquiesced. *Id.* Approximately six years later, Teva filed a citizen petition contesting FDA's actions. *Id.* at 1. Teva asked FDA to relist the '952 patent and confirm Teva's eligibility for the 180-day marketing exclusivity based on their original ANDA. *Id.* FDA refused. *Id.*

Teva challenged the decision in district court and sought an expedited preliminary injunction. The district court consolidated the motion for preliminary injunction with the merits case and granted judgment in favor of Teva. On September 12, 2008, we issued an expedited mandate reversing the decision of the district court granting judgment in favor of Teva, and vacating the district court's injunction.

II

At the outset, we reject Teva's claim that FDA raises arguments on appeal not presented to the district court. Teva's confusion is partially explained by its misreading of FDA's decision letter and its tendency to construe the statute's independent publication mandate as if it modified the certification requirement. As explained more fully below, these requirements remain separate. And that is the position consistently asserted by FDA. FDA's effort to refine and clarify its analysis in light of the district court's ruling cannot be transmuted into a waiver of its arguments on appeal. *See Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.").

A

Turning to the merits, we review FDA's interpretation of the Act it administers under step one of the two-step analysis in *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43 (1984) ("[T]he court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). The statute provides that, in order to qualify for the 180-day marketing exclusivity under paragraph IV, an ANDA must contain, *inter alia*:

> [A] certification . . . with respect to each patent which *claims* the listed drug . . . or which *claims a use* for such listed drug for which the applicant is seeking approval . . . that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted.

21 U.S.C. § 355(j)(2)(A)(vii) (emphasis added). The same requirement appears, with slight variation, in the FDA regulation. *See* 21 C.F.R. § 314.94(a)(12). How a manufacturer triggers the 180-day marketing exclusivity is clear under the text of the statute: no ANDA applicant can obtain exclusivity without a proper paragraph IV certification. 21 U.S.C. § 355(j)(5)(B)(iv). A successful paragraph IV certification must identify a patent that "claims the listed drug" or that "claims a use for such listed drug for which the applicant is seeking approval." *Id.* § 355(j)(2)(A)(vii). In the absence of such a patent, there can be no paragraph IV exclusivity.

Teva's ANDA did not meet the clear and unambiguous requirements of the statute because it did not and could not include a certification to a patent that claimed Risperdal.[1] According to Black's Law Dictionary, a patent claim is "[a] formal statement describing the novel features of an invention and defining the scope of the patent's protection." BLACK'S LAW DICTIONARY 1160 (8th ed. 2004). The statute requires NDA holders to ascertain if, under substantive patent law, any patents claim the drugs for which the NDA holder submitted an application and then provide FDA with patent information for any drug which falls within the scope of a patent's protection. 21 U.S.C. § 355(b). The legislative purpose underlying paragraph IV is to enhance competition by encouraging generic drug manufacturers to challenge the patent information provided by NDA holders in order to bring generic drugs to market earlier. Thus, for paragraph IV purposes, a "claim" is simply a description of the subject a patent purports to cover as established by the NDA holder. *See Engine Mfrs. Ass'n v. EPA*,

---

[1] Even if the meaning of "claims" were ambiguous, FDA adopted a reasonable interpretation of the statute's certification requirements under *Chevron* step two. Therefore, employing either analysis, Teva failed to meet the statutory prerequisites for marketing exclusivity.

88 F.3d 1075, 1088 (D.C. Cir. 1996) (recognizing if a statute "clearly requires a particular outcome, then the mere fact that it does so implicitly rather than expressly does not mean that it is 'silent' in the *Chevron* sense"). All patent claim information is provided by the NDA holder. Therefore, as a practical matter, a patent claims a drug when the NDA holder says it does.

When it comes to the veracity of the patent information supplied by NDA holders, FDA operates in a purely ministerial role, relying on the NDA holders to provide the Agency with accurate patent information. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1080 (D.C. Cir. 2001). This approach is consistent with the statute, which requires FDA to publish submitted patent information, but does not require FDA to review the merits of the patent information provided. 21 U.S.C. § 355(b)(1). Several courts have affirmed this common-sense policy choice. *See, e.g.*, *Am. Bioscience*, 269 F.3d at 1080; *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1348–49 (Fed. Cir. 2003); *aaiPharma Inc. v. Thompson*, 296 F.3d 227, 242–43 (4th Cir. 2002). Consequently, in determining what drugs a patent claims or covers for purposes of a paragraph IV certification, the patent's actual scope is irrelevant. *See, e.g.*, *Purepac Pharm. Co. v. TorPharm, Inc.*, 354 F.3d 877, 883 (D.C. Cir. 2004). Rather, FDA must base its decision on what the NDA holder asserts a patent claims. *Id.*

Here, the facts are undisputed. On August 28, 2001, when Teva submitted its ANDA for a generic version of Risperdal, no patent claimed Risperdal because Janssen had withdrawn the '952 patent. Moreover, FDA had removed the listing from the electronic version of the Orange Book. FDA informed Teva of the discrepancy and Teva withdrew its paragraph IV certification. When Teva filed its citizen petition on August 3, 2007, asking FDA to confirm its eligibility for 180-day exclusivity, the Agency refused. Its decision letter rejecting

Teva's citizen petition accurately reiterated the sequence of events. The letter noted FDA's staff, conducting routine filing reviews, always checks to see if "patent certifications contained in the ANDA correspond to the patents actually listed for the reference listed drug, as assessed by the most current patent information the Agency has received." *See* FDA Letter at 8.

B

Teva nevertheless claims its ANDA certification was valid because one version of the Orange Book still listed the patent. Neither this Court nor FDA has ever confronted the peculiar factual circumstances present in this case. We have, however, considered the vexed question of marketing exclusivity in other contexts and held that FDA may not delist a patent once a valid paragraph IV certification has been submitted, *Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 126 (D.C. Cir. 2006)(holding "unlawful the FDA's policy requiring that the first filer of a paragraph IV certification be sued in order to preserve its statutory exclusivity when the NDA holder seeks to delist the patent rather than to litigate"), and that 21 U.S.C. § 355(j)(5)(B)(iv) precludes FDA from conditioning marketing exclusivity upon an ANDA applicant prevailing in patent litigation, *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1069 (D.C. Cir. 1998); *see also Purepac Pharm. Co. v. Friedman*, 162 F.3d 1201, 1204–05 (D.C. Cir. 1998).

Unfortunately for Teva, an ANDA applicant's right to a period of marketing exclusivity does not vest merely because a paragraph IV certification is filed. Only compliance with paragraph IV triggers exclusivity, and compliance presupposes the existence of a claiming patent. The claim is a prerequisite; without it, there can be no valid certification. Inadvertent failure by the agency to meet its separate publication requirement cannot defeat facts. Indeed, for this Court to accept

Teva's position, we would have to accept the proposition that even partial inadvertence is sufficient. The electronic version of the Orange Book reflected the withdrawal of the '952 patent at least a month before Teva submitted its certification. Teva's argument goes beyond punishing Agency inadvertence; it would reward willful blindness on the part of manufacturers—a position clearly at odds with Hatch-Waxman's focus on fostering competition and lowering drug prices.

Teva argues the instructions prefacing the Orange Book and its Cumulative Supplement constitute binding directives that restrict both applicants and FDA from considering other sources regarding listed patents. FDA counters that statements in the Orange Book are not the law and cannot change the law regarding whether a patent "claims" a drug. FDA is correct; both the statute and the Agency's policies compel FDA to rely on the actual status of a patent (as indicated by the NDA holder) and not on the varying contents of a published reference guide. As FDA's counsel conceded at oral argument, the Agency's failure to list a patent after the NDA holder provided the information would not deprive the branded drug manufacturer of its rights under paragraph IV. Furthermore, the Agency has consistently required ANDA applicants to certify to patents recently submitted to FDA, even if FDA had not yet published the patent in any version of the Orange Book. FDA Letter at 8 n.14. In the end, none of Teva's arguments can overcome one critical lacuna: the lack of any patent claiming the drug.

## III

The NDA holder asked FDA to remove the '952 patent from the Orange Book listing in April and June of 2001—months before Teva attempted to submit a paragraph IV certification. Under the statutory and regulatory structure governing marketing exclusivity, the company's notification

was sufficient for FDA to consider the patent withdrawn. Accordingly, under step one of *Chevron*, Teva did not submit a valid paragraph IV certification and neither the Orange Book nor any of its instructions—however faulty—trump the clear requirements of the statute.

Therefore, in conformity with our mandate issued on September 12, 2008, we reverse the decision of the district court granting judgment in favor of Teva, vacate the district court's injunction, and direct the entry of judgment for FDA.

*So ordered.*

WILLIAMS, *Senior Circuit Judge*, concurring: I write separately to clarify an ambiguity in the majority opinion. The Hatch-Waxman Amendments refer in a number of places to the obligation of a firm filing a "New Drug Application" ("NDA") to include certain information with regard to "any patent which *claims* the drug" in question. 21 U.S.C. §§ 355(b)(1), 355(c)(2) (emphasis added); *see* § 355(j)(2)(A)(vii). This case relates to the obligations of the FDA in relation to that filing, and the opinion seems to me ambiguous in its reading of the statute. The panel opinion says on the one hand that "a 'claim' is simply a description of the subject a patent purports to cover *as established by the NDA holder*." Maj. Op. at 6 (emphasis added). This seems to imply that the statute requires the FDA to accept the NDA holder's listing and delisting decisions, imposing on it the ministerial role that it has chosen for itself. On the other hand, the majority opinion describes the FDA's choice to adopt a ministerial role as a "common-sense policy choice" that is merely "consistent with the statute." *Id*. at 7. I have seen no reasoning either in this opinion or in those of other courts that would support the idea that the statute mandates a ministerial role; for this case, all that is needed is a conclusion that the FDA's adoption of that role is reasonable.

A Fourth Circuit decision, *aaiPharma Inc. v. Thompson*, 296 F.3d 227 (4th Cir. 2002), discusses the matter quite comprehensively. There an NDA holder had refused to include the plaintiff's patent in the list of patents claiming the drug. The plaintiff patent holder wanted the FDA to order the NDA holder to list the patent. At stake was the plaintiff's right under Hatch-Waxman to delay FDA approval of an "Abbreviated New Drug Application" ("ANDA") by up to 30 months, by suing the ANDA applicant for patent infringement. *Id*. at 236, 242; see 21 U.S.C. § 355(j)(5)(B)(iii).

The FDA's position was that its role in the process was purely ministerial, while the plaintiff insisted that in case of a dispute the FDA had to make its own determination about a patent's eligibility for listing. *Id*. at 237. Both parties argued that their view was clearly mandated by the statute. *Id*. at 238. After a careful analysis, the court concluded that Congress had "failed to express clearly its intent about the FDA's role," *id.*, but that the FDA's construction of the statute was "permissible." *Id*. at 241.

Yet in reaching that conclusion the court noted specific provisions and elements of the statutory scheme favoring the plaintiff's position. For example, it noted that §§ 355(d)(6) and (e)(4) specifically authorize FDA disapproval, or withdrawal of approval, of an NDA application if the NDA applicant failed to fulfill its patent-listing obligations. *Id*. at 238. Moreover, it generally found "plausible" the plaintiff's argument that there must be a mechanism for enforcing those obligations, so as to protect the third-party patent holder's Hatch-Waxman rights. *Id.* at 242. It found "some force," furthermore, in the plaintiff's conclusion that since private enforcement was unavailable, the FDA had to fill the enforcement gap. *Id.* at 243. Against these elements, among other things, were the FDA's claim of severe resource constraints and indications that in practice patent holders had not been much jeopardized.

Two propositions flow from *aaiPharma*. First, the FDA's ministerial role in the Orange Book listing process is not mandated by the statute. Second, third-party patent holders have rights under Hatch-Waxman which are currently at the mercy of the NDA holder and which the FDA could vindicate by taking a more active role in the listing process. It seems quite likely, then, that had the FDA adopted the plaintiff's position and sought to protect third-party patent holders, the

*aaiPharma* court would have viewed that construction of the statute as reasonable too.

These considerations apply at least as strongly to the present case, which concerns a dispute over a delisting rather than a dispute over a failure to list. The statute has even less to say about it; as the FDA has pointed out, the statute is "silent with regard to the withdrawal of patent information previously submitted for listing in the Orange Book." *Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 124 (D.C. Cir. 2006). And the policy of protecting third-party patent holders applies just as strongly.

The Federal Circuit adopted the *aaiPharma* approach in *Apotex, Inc. v. Thompson*, 347 F.3d 1335 (Fed. Cir. 2003). There, the plaintiff wanted the FDA to delist certain patents which it contended did not claim the relevant drug. *Id.* at 1347. Citing *aaiPharma*, the court held that "[w]e agree with the Fourth Circuit that the statute does not speak clearly to this issue." *Id.* at 1348. Ultimately, as in *aaiPharma*, the court concluded that the FDA's approach was reasonable. *Id.* at 1349.

This circuit's cases are consistent with *aaiPharma* and *Apotex*. They take the FDA's choice of a ministerial approach as a given, without implying that the choice was mandated by the statute. *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004) (noting that the FDA "leaves to the courts" the issue of what patents actually cover); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1080 (D.C. Cir. 2001) (explaining that "[t]he FDA, pursuant to longstanding practice and its own regulations, and based on its acknowledged lack of expertise and resources, has refused to become involved in patent listing disputes, accepting at face value the accuracy of NDA holders' patent declarations and following their listing instructions").

Thus, to read the majority opinion as implying that the statute locks the FDA into a ministerial role would be inappropriate.  Such a reading would prevent the FDA from taking a more active role in the listing process, thereby better protecting third parties' rights, and finds no support in the cases cited by the majority opinion, Maj. Op. at 7.  The statute and the cases do, however, support the panel opinion's view that the FDA's decision to adopt a ministerial role in the listing process represents simply a permissible "common-sense policy choice."  *Id.*